# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MALAY KONG,                                CASE NO. 1:09-cv-01410-SMS

              Plaintiff,

                                 ORDER REVERSING AGENCY'S
                                 DENIAL OF BENEFITS AND REMANDING
    v.                            FOR SUPPLEMENTAL PROCEEDINGS

MICHAEL ASTRUE,
Commissioner of Social Security,

              Defendant.
_____/

      Plaintiff Malay Kong, proceeding *in forma pauperis*, by her attorneys, Law Offices of

Lawrence D. Rohlfing, seeks judicial review of a final decision of the Commissioner of Social

Security ("Commissioner") denying her application for supplemental security income  ("SSI"),

pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act").  The

matter is currently before the Court on the parties' cross-briefs, which were submitted, without

oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1]  Following

a review of the complete record and applicable law, this Court reverses the Commissioner's

decision and remands for further proceedings consistent with this opinion.

///

///

///

---

[1]  Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 8 & 9).

I.   **Administrative Record**

A.   **Procedural History**

On July 13, 2005, Plaintiff filed for supplementary security income, alleging disability beginning January 20, 2006.[2]  AR 9.  Her claim was initially denied on January 12, 2007, and upon reconsideration, on August 6, 2007.  AR 9.  On September 11, 2007, Plaintiff filed a timely request for a hearing.  AR 9.  Plaintiff appeared and testified through a Khmer interpreter at a hearing on November 21, 2008.  AR 19-32.  On October 24, 2007, Administrative Law Judge Stephen W. Webster ("ALJ") denied Plaintiff's application.  AR 9-18.  The Appeals Council denied review on June 5, 2009.  AR 1-3.  On August 4, 2009, Plaintiff filed a complaint seeking this Court's review (Doc. 1).

B.   **Agency Record**

**Adult function report (9/27/2006) (AR 134-141).**  When Plaintiff (born December 13, 1961) felt better, she cooked rice and did all the other chores.  Now she needed help to complete her chores and care for her children.  When she cooked, she did not finish, requiring her husband to assist her. Nonetheless, she cleaned and picked up the trash. She had bad dreams that woke her in the middle of the night.  She had difficulty lifting, bending, standing, reaching, kneeling, talking, stair climbing, seeing, remembering, completing tasks, concentrating, following instructions, using her hands, and getting along with others.  She could walk a block, then needed to rest for five minutes.  She could pay attention for two minutes.  Sometimes she could follow spoken instructions.  She did not finish what she started.  She took medication for stress.  She was afraid of noise.

Plaintiff had no problems with personal care.  She enjoyed watching television with her family.  Sometimes, she preferred to be alone.

Plaintiff needed reminders of when to take her medicine. She left her home twice a month to attend clinic.  She did not go out alone since she could not remember where she needed to go. Her poor memory prevented her from handling money or performing other financial tasks.

---

[2] Plaintiff previously filed applications for SSI on February 5, 1999, and October 31, 2003.  AR 9.

1       A third party adult function report (9/27/2006), prepared by Plaintiff's husband, Saroun

2  Rin, provided information consistent with Plaintiff's adult function report.  AR 126-133.

3       **Adult function report (4/12/2007) (AR 154-161).**  Plaintiff reported that she was unable

4  to do anything she did before: cook, clean, or keep house.  She watched television all day.  Her

5  husband cooked and cared for the house and the children.  Plaintiff only picked up small trash

6  from the floor.

7       Plaintiff was able to perform personal care.  She went outside twice a week.  Her husband

8  drove her because she could not read English and risked becoming lost in Fresno.  Twice a month,

9  Plaintiff and her husband shopped for food and children's clothing.  Plaintiff did not perform

10  financial tasks, such as counting money or paying bills, since it took her forever to get it right.

11  Her illness did not change her ability to handle money.

12       Plaintiff did not spend time with others.  She was easily angered.  Her "bad condition"

13  impaired her ability to get along with her family.  Her "bad condition" also affected her ability to

14  lift, bend, kneel, talk, see, remember, complete tasks, concentrate, understand, follow instructions,

15  and get along with others.  She could pay attention for one minute.  She could not follow

16  directions because her poor memory made her angry.

17       Plaintiff reported a new physician: Mohinder S. Poonia, M.D.  Her medications included

18

19

20

21

22

23

24

25

26

27

28

Lopid,[3] Trazodone,[4] Seroquel,[5] APAP,[6] Metformin[7], Mevaer,[8] and Tobradex.[9]

A third party adult function report (4/12/2007), prepared by Saroun Rin, provided information consistent with Plaintiff's adult function report.  AR 162-169.

**Plaintiff's medications (AR 183)**.  On October 9, 2008, Plaintiff's attorney reported to the agency that Plaintiff was then taking the following prescriptions: Metformin, Ibuprofen,[10] APAP, Amlodipine,[11] Simvastatin,[12] Sertaline,[13] Trazodone, Seroquel, and Megestrol Acetate.[14]

---

[3]  Lopid (gemfibrozil) is used with diet changes to control cholestrol and triglycerides. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000854 (February 4, 2011).

[4]  Trazodone is a serotonin modulator used to treat depression. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000530 (February 4, 2011).

[5]  Seroquel (quetiapine) is used to treat the symptoms of schizophrenia, mania, and depression. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001030 (February 4, 2011).

[6]  APAP is acetaminophen.  www.merriam-webster.com/medical/apap (February 4, 2011).  Acetaminophen is prescribed to relieve moderate pain from headaches, muscle aches, menstrual periods, colds and sore throats, toothaches, backaches, and reactions to vaccinations, and to reduce fever. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000521 (February 4, 2011).

[7]  Metformin is used with other medications to control type 2 diabetes. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000974 (February 4, 2011).

[8]  The Court has been unable to identify any medication called Mevaer.  Plaintiff may have intended to refer to Mevacor (lovastatin), which is used, along with lifestyle changes, to reduce serum cholestrol. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000877 (February 4, 2011).

[9]  Tobradex, a combination of Tobramycin (an antibiotic) and Dexamethasone (a steroid), is used to treat eye infections.  www.drugs.com/tobradex.html.  (February 4, 2011).  (Plaintiff submitted medical notes for a March 1, 2007, appointment with Ben Rad, M.D., who treated Plaintiff for conjunctivitis ("pinkeye").  AR 281.)

[10]  Ibuprofen is a nonsteroidal anti-inflammatory drug used to relieve pain, tenderness, swelling, and stiffness caused by arthritis, as well as menstrual pain, headaches, the common cold, toothaches, and backaches. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000598 (February 4, 2011).

[11]  Amlodipine is used alone or in combination with other medications to treat high blood pressure and chest pain.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000914 (February 4, 2011).

[12]  Simvastatin is used together with lifestyle changes to reduce serum cholestrol and triglycerides. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000911 (February 4, 2011).

[13]  Sertaline is an SSRI used to treat depression, obsessive compulsive disorder, panic attacks, and social anxiety disorder.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001017 (February 4, 2011).

[14]  Megestrol Acetate is used to treat anorexia, cachexia, or unexplained weight loss in patients with AIDS. www.rxlist.com/megace-drug.htm (February 4, 2011).  Plaintiff's listing reports that Dr. Parayno prescribed it for depression.

**Clinton Medical records (AR 188-195).**  The record includes notes completed by Plaintiff's doctors at Clinton Medical, indicating continuing treatment for high cholestrol, depression, and type 2 diabetes mellitus.  Lab tests dated May 22, 2006, indicated elevated levels of blood glucose and triglycerides.

**Fresno County Department of Mental Health (AR 197-231, 283-296).**  Between May 17, 2006, and May 16, 2007, Plaintiff was eligible to attend therapy sessions intended to address her depression, improve her self confidence, and become able to function independently. (Plaintiff had received the same services prior to the period relevant to this SSI application.) Plaintiff's issues arose from her husband's periodic abandonment of home and family  (Plaintiff's husband would leave their home for weeks at a time without explanation), and disagreements with her children.  Plaintiff was troubled by her family's financial difficulties.  Her husband did not want to work.  She perceived that her husband and youngest child disliked and mistreated her. Plaintiff reported depression and anger at addressing her family problems.  The family's difficulties were impeding Plaintiff's ability to perform her daily activities.

On at least eight occasions, Plaintiff missed her group meeting, sometimes calling to report ill health or another appointment.  When Plaintiff attended group meetings, however, she interacted with her peers and often seemed to enjoy the planned activities.  She reported feeling isolated, and stated that she planned a monthly family outing when she received their aid check. At multiple sessions, she told staff that she enjoyed spending time with her children.  Plaintiff and her children cooked together at least three times a week.  In March 2006, she reported that she had begun taking a daily walk around the block to improve her strength.  On several occasions, she reported that her mood was improving.

In April 2006, Plaintiff reported that the cold weather disturbed her sleep.  She also reported that she enjoyed going to the park with her children and socializing with her neighbors.

Following local demonstrations in May 2006, Plaintiff reported flashbacks to her war trauma and nightmares.  She was feeling more depressed and turned to friends for support.  But by mid-May, she was able to enjoy a group meeting at which the participants played Bingo, smiling and laughing with her peers.

1    In June 2006, Plaintiff complained of troubles with her children and hot weather.  At a

2  therapy session later in June, she advised her peers on ways to act independently, telling them to

3  persevere even when they fail.  In July, she enjoyed a group trip to the Roeding Park zoo and

4  hoped to return with her family.  In July and August, she requested further interaction with friends

5  in the group.  At another session, she indicated a desire to feel better and be able to do more at

6  home.

7    Plaintiff learned of community news from friends since she could not understand the

8  television news.  She experienced language problems, particularly with a new physician who did

9  not have an interpreter, complaining that her children were unwilling to translate for her.

10 Although Plaintiff had reportedly attended classes at Fresno Adult School for many years, she still

11 could not read or understand English.

12    In February 2007, Plaintiff felt depressed and hopeless and complained of arthritis pain.

13 She could not perform as much housework as she would like.  As she aged, she was becoming

14 less interested and motivated.  At the end of the month, Plaintiff reported that her anger and

15 depression had subsided.

16    Plaintiff felt depressed about holiday celebrations in March, complaining of her lack of

17 sufficient money to celebrate since she only had AFDC funds.  But she reported increased desire

18 to celebrate this year, perhaps even to join in festivities at the Buddhist temple.  She continued to

19 derive support from friends.

20    Because Plaintiff had stopped attending group sessions, her therapists recommended that

21 FCMH to drop her from group therapy on May 3, 2007.  On May 17, 2007, services to Plaintiff

22 were approved for an additional year.  On August 1, 2007, Plaintiff told FCMH that she no longer

23 wished to attend the program.

24    **Psychiatric records (AR 298-311).**  Maximo A. Parayno, Jr., M.D., supervised

25 psychiatric medication incident to Plaintiff's treatment by FCMH.  On May 31, 2008, on a

26 Calworks questionnaire, he reported that, although Plaintiff's disability was not permanent she

27 was unable to perform any work through December 1, 2008.  Except for October 20, 2007, when

28 ///

he added that Plaintiff "forgets to turn on the rice cooker," Dr. Parayno's assessment of Plaintiff remained the same throughout from June 3, 2006, through June 21, 2008:

> Does not know date, address, phone no. & DOB.  Forgetful–loses valuable items at home.  Burns pots & pans & food on stove.

According to Plaintiff, Dr. Parayno told her to apply for SSI.  AR 185.

**Plaintiff's testimony.**  Plaintiff testified through a Cambodian interpreter.  She watched television, although she did not understand the language.  She did not read, visit with friends, attend church or temple, or go to movies.  She had never worked for wages, subsiding on welfare.  She had no schooling.

Plaintiff lived in an apartment with three of her four children.  Her husband had left her.  She was capable of taking care of her own personal grooming, including bathing, dressing, and hair care.   With her children's help, she cleaned her home, did laundry, cooked, and shopped.

On a typical day, Plaintiff would rise at five or six o'clock, wash her face, and brush her teeth.  She did not eat breakfast.  She would sit until she ate lunch, then sit more or walk around.  She had dinner alone or with her children, then sat around until bed time.  She did not nap.  She awoke several times during the night.  She had friends but had no one to take her to visit them since her husband left.

Plaintiff repeatedly testified that she did not remember certain basic information, including her height, weight, when she had a driver's license, how many hours a day she watched television, or the time she went to bed.  She did not know when her husband left her.  She was uncertain how long she could sit or stand, how far she could walk, or the heaviest thing she could lift.  She did not know how long she could concentrate.

Plaintiff testified that she suffered from back pain, head aches, depression, and "all kinds of things."  She did not acknowledge that she suffered from PTSD.  She was depressed every day, sitting by herself, thinking, and crying.  She saw her doctor every two months to renew her medication, but could not remember the doctor's name.  She saw different doctors for psychiatric problems and diabetes.  The prescribed medication helped Plaintiff "when she took it."

///

**Medical consultant's report (AR 234-237).**  Rustom F. Damania, M.D., examined Plaintiff on behalf of the agency.  He diagnosed type II diabetes, hyperlipedemia, and depression, all by history.  He performed no lab tests and found no abnormalities in his physical examination of Plaintiff.  He opined:

> The patient is a 45-year-old female.  The patient should be able to lift and carry 50 pounds occasionally and 25 pounds frequently.  The patient should be able to stand and walk for eight hours out of a normal eight hour workday with normal breaks. The patient should be able to sit without restriction.  The patient does not require an assistive device for ambulation.  No postural limitations.  No manipulative limitations.  No relevant visual impairment.  No definitive communication impairment.

AR 237.

**Physical capacities evaluation (AR 313-314).**  On November 11, 2008, Mohinder Poonia, M.D., completed a physical capacities evaluation of Plaintiff's behalf.[15]  He opined that Plaintiff could sit one hour in an eight-hour workday; stand one hour in an eight-hour workday; and walk one hour in an eight-hour workday.  She needed to elevate her legs nine inches while sitting and needed to alternate sitting and standing every "½ minutes/hours."  She could frequently lift up to five pounds but could never lift anything heavier.  She could frequently bend or kneel, but could never squat, crawl, climb, or stoop.  Plaintiff was moderately restricted from wet or humid activities and totally restricted from extreme heat or cold; noise; vibration; fumes, odors, dust, gases, and poor ventilation; and machinery or heights.  Her distance vision and accommodation were limited.  According to Dr. Poonia, Plaintiff's restrictions are necessitated by diabetes, hypertension, gastro-esophagal reflux, osteoarthritis, hyperlipedemia, thyroid goiter, migraine headaches, dizziness, nervous breakdown, "can't sleep," and depression.

**Psychiatric consultant's report (AR 238-241).**  Shireen R. Damania, M.D., examined Plaintiff on behalf of the agency.  The only treatment records provided to her were records of Plaintiff's group therapy at Fresno County Mental Health.  Accordingly, Damania relied on information from Plaintiff, "who was superficially cooperative, volunteered little information, but

///

---

[15]   The form was prepared for Dr. Parayno, whose name has been crossed out and replaced with Dr. Poonia's handwritten name.

answered the questions that were asked of her," (AR 238) and from her own observations of

Plaintiff.  Damania diagnosed Plaintiff:

| | | |
|---|---|---|
| Axis I | Depressive Disorder Not Otherwise Specified. 311 | |
| Axis II | No diagnosis. V71.09 | |
| Axis III | 1.  Obesity Mild.<br>2.  Diabetes Mellitus.<br>3.  hyperlipedemia. | |
| Axis IV | Level of Psychosocial Stressors–Mild (unemployed, financial concerns, health concerns). | |
| Axis V | G.A.F. Current – 61.  Highest past year – 61. | |

AR 240.[16]

Damania opined:

> In the event the claimant was to receive financial benefits, she would be able to handle her funds judiciously in her own best interests.
>
> Medical Source Statement Psychiatric – The claimant was prompt for her appointment, with adequate interpersonal and social skills.  No difficulties were noted in memory, concentration, persistence and pace.  There was no evidence of any emotional lability or deterioration.
>
> She is able to understand, carry out, and remember simple one- and two-step job instructions in an unskilled setting.  She is able to respond appropriately to coworkers, supervisors, and the public.  She is able to respond appropriately to usual work situations and deal with changes in a routine work setting if the instructions are presented simply and unidimensionally.

AR 240-241.

**Agency's residual functional capacity assessment (AR 259-265).**  R.D. Fast determined

that Plaintiff was able to occasionally lift 100 pounds or more; frequently lift 50 pounds or more;

---

[16]  The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall functioning on Axis V of the diagnosis.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR").  It considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in functioning due to physical (or environmental) limitations." *Id*. at 34.  The first description in the range indicates symptom severity; the second, level of functioning.  *Id*. at 32.  In the case of discordant symptom and functioning scores, the final GAF rating always reflects the worse of the ratings.  *Id*. at 33.

   GAF 61 is at the bottom of the range GAF 61-70, which indicates ""[s]ome mood symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id*. at 34.

stand or walk at least six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and perform unlimited push-pull operations.  He found no postural, manipulative, visual, communicative, or environmental limitations.  Fast noted that Plaintiff had multiple prior denials of disability applications with no change in her physical condition.

**Agency's psychiatric review technique (AR 266-279).**  Archimedes R. Garcia, M.D., performed his analysis on alleged affective and anxiety-related disorders.  Although Plaintiff exhibited depression and post-traumatic stress disorder ("PTSD"), her impairments did not meet the regulatory diagnostic criteria.  Garcia opined that Plaintiff experienced mild restrictions in daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, and pace.  He assessed Plaintiff as having moderate limitations in her ability to understand and remember detailed instructions and moderate inability to carry out detailed instructions.

**Vocational expert testimony.**  Jose L. Chaparro[17] testified as the vocational expert.  In the first question, the ALJ asked Chaparro to assume a hypothetical person of Plaintiff's age, education, and work experience, with no exertional or postural limits, but limited to simple, routine, and repetitive work.  Chaparro testified that numerous (90,000 positions nationally; 54,000 in California) medium, unskilled positions of SVP 1 and SVP 2 were available in nineteen categories of agricultural jobs, including root trimmer, animal breeder, and fruit harvest worker.  Medium and unskilled positions (SVP 2) (134,500 positions nationally; 16,000 in California) also existed for packaging and filling machine operators and tenders.

For the second question, the ALJ directed Chaparro to assume a hypothetical person of Plaintiff's age, education, and work history, capable of lifting 50 pounds occasionally and 25 pounds frequently, and limited to simple, routine, and repetitive work.  Chaparro replied that his answer to this question was the same as his answer to the first question.

///

///

[17] In the transcript, Mr. Chaparro's name is indicated as "Shapiro."

10

1    Finally, the ALJ asked Chaparro to make the same assumptions as the second question but
2  to also assume that the hypothetical person would have occasional problems maintaining attention,
3  concentration, and pace.  In that case, replied Chaparro, no jobs would be available.

4    Plaintiff's counsel did not question Chaparro.

5  **II.    Discussion**

6    **A.    Legal Standards**

7    To qualify for benefits, a claimant must establish that he or she is unable to engage in
8  substantial gainful activity because of a medically determinable physical or mental impairment
9  which has lasted or can be expected to last for a continuous period of not less than twelve months.
10 42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of
11 such severity that he or she is not only unable to do his or her previous work, but cannot,
12 considering age, education, and work experience, engage in any other substantial gainful work
13 existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

14    To encourage uniformity in decision making, the Commissioner has promulgated
15 regulations prescribing a five-step sequential process for evaluating an alleged disability.  20
16 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following
17 questions:

18  Step one:    Is the claimant engaging in substantial gainful activity?  If so, the
19               claimant is found not disabled.  If not, proceed to step two.

     Step two:    Does the claimant have a "severe" impairment?  If so, proceed to
20               step three.  If not, then a finding of not disabled is appropriate.

21  Step three:  Does the claimant's impairment or combination of impairments meet
               or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.
22               1?  If so, the claimant is automatically determined disabled.  If not,
               proceed to step four.
23
     Step four:   Is the claimant capable of performing his past work?  If so, the
24               claimant is not disabled.  If not, proceed to step five.

25  Step five:   Does the claimant have the residual functional capacity to perform
               any other work?  If so, the claimant is not disabled.  If not, the
26               claimant is disabled.

27  *Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

28  ///

11

1  The ALJ found that Plaintiff had not engaged in substantial gainful activity since June 13,
2  2006.  AR 11.  Plaintiff had three severe impairments: diabetes mellitus, depression, and post
3  traumatic stress disorder.  AR 1.  Her impairments did not meet or medically equal one of the listed
4  impairments in 20 C.F.R. Part 404, Subpt. P. Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and
5  416.926).  AR 11.  Plaintiff had no past relevant work.  AR 16.  Plaintiff had the residual
6  functional capacity to lift 50 pounds occasionally and 25 pounds frequently, to sit, stand or walk
7  for eight hours in an eight-hour workday, but was limited to simple routine repetitive work .  AR
8  13.  After considering Plaintiff's age, education, work experience, and residual functional capacity,
9  the ALJ concluded that jobs that Plaintiff could perform existed in the national economy in
10  significant numbers.  AR 17.

11      **B.    Scope of Review**

12      Congress has provided a limited scope of judicial review of the Commissioner's decision to
13  deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a
14  court must determine whether substantial evidence supports the Commissioner's decision.  42
15  U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*,
16  402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112,
17  1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as
18  adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be
19  considered, weighing both the evidence that supports and the evidence that detracts from the
20  Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the
21  evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.,*
22  *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's
23  determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if
24  the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and*
25  *Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  The scope of review requires this Court to
26  consider the record as a whole, examining both the evidence supporting the ALJ's decision and the
27  evidence that does not.
28  ///

12

1    **C.    Did the ALJ Fail to Give Sufficient Weight to Parayno's Opinion?**

2        Plaintiff maintains that the ALJ failed to give due weight to the opinion of her treating

3    physician, Dr. Parayno.  The Commissioner responds that the ALJ properly credited the contrary

4    opinion of Dr. Shireen Damania.

5        Three types of physicians may offer opinions in social security cases: "(1) those who

6    treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the

7    claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant

8    (nonexamining physicians)."  *Lester*, 81 F.3d at 830.

9        A treating physician's opinion is generally entitled to more weight that the opinion of a

10   doctor who examined but did not treat the claimant, and an examining physician's opinion is

11   generally entitled to more weight than that of a non-examining physician.  *Id.*  The Social Security

12   Administration favors the opinion of a treating physician over that of nontreating physicians.  20

13   C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A treating physician is employed to cure and has a

14   greater opportunity to know and observe the patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th

15   Cir. 1987).

16       This Court's task is not to re-weigh the evidence but to determine whether the ALJ's

17   determination is supported by substantial evidence and free of legal error.  The Court must review

18   the ALJ's express reason(s) for declining to adopt a doctor's opinion and determine whether the

19   rejection was specific and legitimate.

20       Although an ALJ need not discuss every piece of evidence, he or she must consider the

21   combined effect of all of the claimant's impairments, including those that are not, by themselves,

22   of sufficient severity to establish a disability  *Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir.

23   2003).  The ALJ may only consider limitations or restrictions attributable to medically

24   determinable impairments, not those attributable to other factors such as body build, age, or prior

25   experience.  S.S.R. 96-8p at *2 (June 2, 1996).

26       Noting the repetitive nature of Parayno's bimonthly notes and the lack of documentary

27   support for Parayno's evaluation prepared for Calworks, the ALJ gave Parayno's opinion little

28   weight:

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonable be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and timing effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.  As noted above, the claimant receives routine medication for management of her impairments.

While PTSD is an alleged diagnosis, the claimant stated that she does not know what that is.  She does not offer any complaints of flashbacks, symptoms of panic or anxiety.  She does complain of nightmares and admits to difficulty sleeping and periods of wakefulness.  There is no documentation that mentions or describes a traumatizing event in the claimant's life other than the fact that she was in Cambodia when the communists invaded and she and her husband fled to Thailand as refugees.  Most of her statements to treating providers that pertain to feelings of anxiety or sleeplessness are related to financial concerns.  The claimant reported to Dr. Parayno on September 13, 2008 that she could not sleep because the daughter that lives with her will be turning 18 soon and AFDC and food stamps will stop and she will lose financial support.

In terms of the claimant's alleged depression, the claimant has been treated for major depression recurrent, without psychotic features with antidepressant medication prescribed by Dr. Parayno whom she sees about every 2 months.  Interestingly, he documents the same statements month after month: for example on June 3, 2006 he notes the claimant is alert and oriented in one out of 4 spheres (person) with a blunted affect and poor concentration/attention.  His assessment is "Does not know date, address and phone number . . . misplaces things at home . . . burns pots & pans."  On September 23 2006 he notes the claimant "does not know address, date . . . & phone number.  Forgetful loses things at home . . . burns pots & pans," and on August 12, 2007 "Does not know date, address, home no. and DOB.  Forgetful–misplaces things at home.  Burns pots & pans.  In addition, on October 20, 2007 he completed a verification of physical/mental incapacity for general assistance verifying the claimant "can perform no work" and that she could not care for herself.  Likewise on May 31, 2008 he submitted the same document with the same statements. Generally controlling weight is given to a treating source's opinion.  However, in this case, no rationale was given for the claimant's inability to work, he did not give the criteria that he used to base his decision that claimant could not work.  He stated she could not care for herself but did not arrange for hospitalization or a lesser but appropriate level of care.  Additionally, according to his progress notes the claimant's condition remained absolutely static for a period of 20 months.  Little weight is assigned to the claimant's treating psychiatrist as his documentation is repetitive and shows a lack of any response to treatment or treatment response to the claimant's condition over a two year period.

AR 14-15 (*internal citations omitted*).

This Court agrees with the ALJ's determination to give little weight to Parayno's opinion.

The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a

1  medical opinion.  28 C.F.R. § 404.1527(d).  Dr. Parayno's relationship with Plaintiff was limited to

2  bimonthly appointments to renew Plaintiff's psychiatric medications.  The repetition in his

3  treatment notes suggests that, although Parayno likely used the interpreter to determine whether

4  anything compelled a change in Plaintiff's prescribed medication, no real communication occurred

5  between Plaintiff and Parayno.  (Compare Dr. Shireen Damania's observation that, although

6  Plaintiff responded to her questions, she did not freely provide information.)  The bulk of the

7  therapy and communication occurred in the group sessions conducted by other mental health

8  professionals.  These treatment records, provided by FCMH, are consistent with Parayno's

9  generalized conception of Plaintiff's condition, but provide a more complete and complex portrait

10 of Plaintiff, her family and financial worries, her interaction with friends and peers at therapy, and

11 her enjoyment of outings and organized recreation.

12       To the extent that Plaintiff intends her argument to address Parayno's medical report

13 prepared for Calworks, the Court notes that Parayno's opinion that Plaintiff could perform no work

14 was completely unsupported and that Parayno did not consider Plaintiff's inability to work to be

15 permanent.  AR 303.  In addition, an ALJ is "not bound by an expert medical opinion on the

16 ultimate question of disability."  *Tomasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008);

17 *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001); Social Security Ruling 96-5p.

18       Despite Plaintiff's contention that the FCMH records document her continued isolation,

19 those records include multiple accounts of Plaintiff's enjoying various activities with her peers at

20 therapy, reporting to the FCMH therapists that she interacted with neighbors and others, and that

21 she drew support from those contacts.

22       The FCMH therapy records depict Plaintiff as a individual facing problems common to

23 many immigrants, especially those whose refugee past adds the bitter flavor of a life change that

24 may not have been totally voluntary.  In a Fresno apartment, far from her native Cambodia,

25 Plaintiff, completely uneducated and without any work experience, struggled with marital and

26 family problems, insufficient income to finance more than life's basic necessities, and inadequate

27 language skills.  That she experienced mild depression is not surprising, but also is not indicative

28 of complete disability.

1    Although Plaintiff established a severe physical impairment, diabetes, nothing in the

2    treatment records supported any finding of physical disability, except for Dr. Poonia's "physical

3    capacities evaluation."  The ALJ gave Poonia's opinion little weight, explaining that it was

4    inconsistent with the record and had no apparent basis other than Plaintiff's diagnoses.  This Court

5    agrees.   Dr. Poonia's one-shot assessment of Plaintiff's physical capacity includes no information

6    on the source of his opinions or information, and no apparent bases for his remarkable conclusions,

7    which had no apparent connection to any previously diagnosed malady.  The two-page evaluation

8    does not disclose Poonia's medical specialty or whether Poonia ever met or examined Plaintiff or

9    even consulted any of her medical records.  Because nothing else in the record suggests any

10   physical disability, much less the severe disability of which Poonia opines, it is neither supportable

11   nor consistent.

12       **D.    <u>Were Hypothetical Questions Required to Note Plaintiff's Inability to Speak English?</u>**

13

14       Plaintiff contends that the ALJ erred in failing to specify her inability to speak English in

15   the hypothetical questions he propounded to Chaparro.  The Commissioner responds that, because

16   Plaintiff's inability to communicate in English is subsumed within the category of education, the

17   ALJ met his responsibility by directing Chaparro to take Plaintiff's education into account.

18   Plaintiff's contention is correct.

19       If a claimant proves at step four that he or she cannot return to his or her previous job, the

20   burden shifts to the Commissioner to prove the claimant can do other work.  *Embrey v. Bowen*, 849

21   F.2d 418, 422 (9th Cir. 1988); *Gamer v. Secretary of Health and Human Services*, 815 F.2d 1275,

22   1278 (9th Cir. 1987).  To determine what other work, if any, the claimant can perform, an ALJ must

23   use the opinion of a vocational expert.  *Embrey*, 849 F.2d at 422; *Gamer*, 815 F.2d at 1279.

24       "Hypothetical questions posed to the vocational expert must set out *all* the limitations and

25   restrictions of the particular claimant, including, for example, pain and an inability to lift certain

26   weights."  *Embrey*, 849 F.2d at 422.  If the record does not support the assumptions of the

27   hypothetical questions, the vocational expert's opinion is worthless.  *Id.  See also DeLorme v.*

28   *Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir.

1   1984).  Thus, the hypothetical in *Embrey*, which included assumptions without a basis in facts in

2   the record and omitted other symptoms relevant to his ability to work, resulted in an unreliable

3   opinion.  *Embrey*, 849 F.2d at 422.

4          Similarly, the hypothetical question may not omit relevant information.  In *DeLorme*, the

5   expert opinion was put aside since the hypothetical questions included information relevant to the

6   claimant's physical impairments but did not refer to claimant's depression, which might "prove to

7   be a significant limitation when the record is developed."  924 F.2d at 850.  In *Gallant*, the ALJ

8   failed to instruct the ALJ to consider the claimant's constant pain and need to constantly change

9   position. 753 F.2d at 1456.  In *Voong v. Astrue*, a hypothetical question was inadequate when it

10  failed to set forth the claimant's need for an interpreter.  641 F.Supp.2d 996, 1009-10 (E.D. Cal.

11  2009).[18]

12          In *Meza v. Astrue*, the hypothetical question described a person who spoke Spanish and was

13  illiterate.  2011 WL 11499 at *20 (N.D. Cal. January 4, 2011) (No. C-09-1402-EDL).  Because of

14  the claimant's limited English, the ALJ asked the vocational examiner whether there were any

15  simple one- and two-step jobs that the claimant could perform following a brief demonstration

16  ("point and perform").  *Id.* at *21.  The vocational expert opined that such a person could work as a

17  small parts assembler or hand packager.  *Id.* at 20, 21.  The claimant appealed, arguing that, since

18  he was incapable of understanding directions written or spoken in English, he could not possibly

19  perform either of the jobs, rated reasoning level two, which required the ability to: "Apply

20  commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal

21  with problems involving a few concrete variables in or from standardized situations."  *Id.*  The

22  agency responded that language level was a separate variable from reasoning level, which required

23

24          [18]  In *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996), one of the cases on which Plaintiff relies here,
    the court addressed the competence of lay testimony about the claimant's symptoms. Although both the claimant and
25  his wife testified to the claimant's serious coughing, a symptom consistent with the treating physician's medical
    reports and diagnosis, the ALJ disregarded their testimony and omitted the physical manifestations of the claimant's
26  illness from the hypothetical questions that he posed to the vocational expert.  *Nguyen v. Chater*, 100 F.3d 1462,
    1467 (9th Cir. 1996).  The court held that, although medical diagnoses are beyond lay witnesses' competence, lay
27  witnesses are competent to describe a claimant's symptoms and how those symptoms affect the claimant's ability to
    work.  *Id.*  Because the claimant's coughing impeded his ability to perform his job, said the court, the ALJ erred in
28  disregarding the testimony.  *Id.  Nguyen* did not address the question of a claimant with limited or no English.

an individual to be able to use common sense to solve problems of increasing difficulty. *Id.* Citing with approval *Lawson v. Apfel*, 46 F.Supp.2d 941, 945 (W.D. Mo. 1998), the court concluded that the vocational expert's opinion was not inconsistent with the DOT. 2011 WL 11499 at *21.

In *Lawson*, the vocational expert testified that the hypothetical person, a native English speaker with an intellectual impairment, who was described as functionally illiterate, could perform such jobs as photo finisher, hand packer, and laundry folder. 46 F.Supp.2d at 945. Although the vocational expert did not refer to the corresponding DOT job titles, each of the positions, or their DOT equivalent, required Level 1 Language Development, that is, the ability to read 95 to 120 words a minute, the ability to recognize 2500 two- and three-syllable words, and the ability to print simple sentences. *Id.* The claimant appealed, arguing that the vocational expert's testimony contradicted the DOT, and that, because she was illiterate, she could not perform the jobs that the vocational expert identified. *Id.* In the Eighth Circuit, if a vocational expert's opinion contradicts the DOT, the DOT controls. *Id.* at 946 n.6. The court observed:

> Although the Court feels constrained by Eighth Circuit precedent, it does not believe that the VE's testimony was truly contradicted by the DOT in this case. Every job in the DOT has a Language Development level. Level 1 is the lowest Language Development level used in the DOT. A decision holding that illiterate individuals could not perform Level 1 jobs would mean that illiteracy was a *per se* disability under the DOT. Illiterate people would not qualify to work any job listed in the DOT. The Court believes that such holding is illogical and would directly contradict the Social Security regulations. The regulations indicate that Lawson is not disabled simply because she is functionally illiterate. 20 C.F.R. pt. 404, subpt. P, app. 2 § 202.16 (stating that a younger individual, who is illiterate or unable to communicate in English, and who is unskilled or has no prior work experience is not disabled).

*Id.* at 947.

Although the regulations provide that the ALJ will take notice of the DOT (20 C.F.R. § 404.1566(d)(1)), it does not provide that the DOT's definitions bind the ALJ. *Warf v. Shalala*, 844 F.Supp. 285, 289-90 (W.D. Va. 1994). The Virginia court disregarded Eighth Circuit precedent and described a finding of disability because of the conflict between vocational expert and DOT definitions as "absurd," and "illogical and unrealistic, " noting that the claimant had been able to perform his prior job as electrician's helper, which had a language rating of 2, despite his illiteracy. *Id.*

1    Although a claimant's inability to communicate in English limits the jobs he or she can

2    perform, it is not a physical or mental disability of the type social security disability benefits are

3    intended to address.  "A claimant is not per se disabled if he or she is illiterate."  *Pinto v.*

4    *Massanari*,  249 F.3d 840, 847 (9th Cir. 2001).   Nonetheless, an ALJ must not ignore language

5    problems since they are critical to an individual's ability to function in the workplace.  *Id.* at 846.

6    Understanding English is key to understanding and following workplace instructions,

7    communicating with other workers, and responding to supervision.  *Id.*  Because the DOT's level 1

8    language definition requires language ability more advanced than a non-English speaker can meet,

9    if an ALJ determines that a non-English-speaking claimant can perform such a job, he or she must

10   explain why the level 1 language requirement does not apply in that instance.  *Id.* at 847.  If the

11   ALJ omits that analysis, a court cannot review his or her decision.  *Id.*

12         Ninth Circuit precedent is less constricting than Eighth Circuit precedent.  In the Ninth

13   Circuit, an ALJ may rely on a vocational expert's opinion contradicting the DOT if the record

14   includes "persuasive evidence" supporting the deviation.  *Johnson v. Shalala*, 60 F.3d 1428, 1436

15   (9th Cir. 1995).  The ALJ's decision must also set forth a reasonable explanation for the

16   contradiction.  SSR 00-4p; *Light v. Social Security Admin.*, 119 F.3d 789, 793-934 (9th Cir. 1997);

17   *Her v. Astrue*, 2010 WL 3238841 at *5 (E.D. Cal. August 12, 2010) (No. 1:09-cv-0945-SKO).

18   Nonetheless, even when the ALJ included the claimant's language limitations in the hypothetical

19   questions, the Ninth Circuit reversed a decision because the ALJ failed to explain the decision to

20   deviate from the DOT's language requirements.  *Pinto*, 249 F.3d at 846-47.  The Ninth Circuit

21   faulted the ALJ's failure to explain how the claimant's "language and literary abilities" figured in

22   his determination that the claimant could return to her work hand-packing pig feet, chitterlings, pig

23   skin, and chilies.  *Id.* at 846.  *See also Her*, 2010 WL 3238841(explaining that, although an ALJ

24   naturally relies on a vocational expert's testimony, the record must include persuasive evidence to

25   support the opinion and the vocational expert must testify regarding the deviation from the DOT

26   language requirement).

27         As a resident of the Central Valley, this Court would be hard-pressed to believe that an

28   individual with little or no English ability could not harvest fruit or perform a similar unskilled job.

19

1  But legal decisions must be based on evidence adduced in the proceedings.  Plaintiff's disability

2  claim must be remanded for the limited purpose of supplementary proceedings, in accordance with

3  applicable law, to determine the effect of Plaintiff's limited English on her ability to perform the

4  unskilled jobs identified by the vocational expert.

5  **III.    Conclusion and Remand**

6          "The court shall have the power to enter, upon pleadings and transcript of record, a

7  judgment affirming, modifying, or reversing the decision of the Secretary, with or without

8  remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In social security cases, the decision to

9  remand to the Commissioner to award benefits is within the court's discretion.  *McAllister v.*

10 *Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  If additional proceedings can remedy defects in the

11 original administrative proceedings, a social security case should be remanded.

12         Accordingly, this Court orders that the administrative determination be REMANDED for

13 development of an adequate record addressing Plaintiff's inability to communicate in English and

14 the effect of her limited English communication skills on her ability to perform the unskilled jobs

15 identified as otherwise appropriate and available for Plaintiff.  As discussed in this decision, the

16 ALJ must explicitly set forth Plaintiff's inability to communicate in English in his hypothetical

17 questions to the vocational expert, and, in the event he determines that Plaintiff can perform the

18 identified positions following testimony of the vocational expert, set forth his reasoning in

19 determining that Plaintiff can perform the work despite the discrepancy between Plaintiff's

20 language skills and the DOT's level 1 language requirement for the jobs in question.

21         The Clerk of Court is hereby directed to ENTER JUDGMENT in favor of Plaintiff Malay

22 Kong and against Defendant Michael J. Astrue, Commissioner of Social Security.

23

24 IT IS SO ORDERED.

25 **Dated:    February 16, 2011               /s/ Sandra M. Snyder**
                                     UNITED STATES MAGISTRATE JUDGE

26

27

28